UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DREW CASSEUS,

                Petitioner,

          -against-

Superintendent THOMAS GRIFFIN,

             Respondent.
-------------------------------------------------------x

**MEMORANDUM & ORDER**

16 CV 728 (RJD)

DEARIE, District Judge.

Before the Court is the application of petitioner Drew Casseus for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted on February 27, 2012, after a jury trial in Supreme Court, Richmond County, of murder in the second degree (intentional, on a transferred-intent theory), P.L. § 125.25(1); attempted murder in the second degree (intentional), P.L. §§ 110/125.25(1); assault in the second degree, P.L. §120.05(2); and criminal possession of a weapon in the second degree, P.L. § 265.03(3).[1]  He was sentenced to concurrent aggregate terms totaling 25 years to life.

Petitioner's best friend, Jonathan Vasquez, and another individual, Thomas Re, had become involved in a fistfight. Agreeing not to use a weapon, Vasquez handed the gun he was carrying to petitioner just before the fight. Vasquez also told petitioner, however, that "if sh*t

---

[1] To place the verdict in context: the court granted the prosecution's request to submit two theories of second-degree murder—intentional, on a transferred-intent theory, and depraved-indifference. See PL § 125.25(2). The court declined the state's further request to submit the theories conjunctively, instead instructing jurors that if they found petitioner guilty of intentional murder, they "must find [him] not guilty" of depraved-indifference, and vice-versa (519). Accordingly, the jury returned a verdict of not-guilty on depraved indifference. The separate subject of which lesser-included-offenses were submitted is discussed infra at pp. 15 et seq.

gets crazy burn that nigga." At some point during the fistfight, when it appeared that Vasquez was in distress, petitioner fired a "warning shot" into the air. Petitioner then fired two more bullets in the direction of the two combatants and the gathering crowd of onlookers. One of these bullets struck Re in the leg while the other, it would soon be discovered, killed Vasquez. After the fight ended and Re was heading away from the scene, petitioner fired several additional bullets toward Re. Petitioner claimed in a Mirandized statement that he fired these additional shots because he heard shots being fired toward him, but no other evidence supports that claim.

In his petition for habeas relief petitioner advances three grounds: (i) the evidence was legally insufficient to establish that he acted with the intent to kill Re (and, therefore, that there was no transferrable intent to support the murder conviction for the death of Vasquez); (ii) the trial court erroneously denied his request to charge justification and this denial deprived him of a fair trial; and (iii) trial counsel was ineffective in declining the court's offer to submit first-degree manslaughter as the lesser-included offense ("LSO") of intentional second-degree murder. Petitioner raised each of these claims on direct appeal, and each was denied, with one justice dissenting as to the ineffectiveness branch of the ruling. People v. Casseus, 120 A.D.3d 828 (2d Dep't 2014).

As discussed below, none of petitioner's claims warrants habeas relief. Accordingly, the application is denied and the petition is dismissed.

## RELEVANT TRIAL EVIDENCE

The principal trial testimony came from the surviving shooting victim Re; three eyewitnesses to the fistfight (Re's sister and her two friends); and petitioner's Mirandized post-arrest statements.

2

According to Re and the other eyewitnesses, Vasquez and petitioner insulted Re on his

way into a store; as Re exited, he exchanged further words with Vasquez and a fight to settle

matters was proposed. Re took off his shirt and jacket to show he was unarmed, and he and

Vasquez agreed to a fistfight.

Re testified that the two were just "gesture fighting" and that "[n]o punches were ever

thrown" (192, 238), while one eyewitness described the incident as a "fistfight" (317, 340-41).

Re had Vasquez "in a headlock" (193, 239, 242; 341-2) and asked if they were now done,

Vasquez concurred, and Re released him. (193-94). But Vasquez then threw another punch at Re

and, either at the same time or immediately after, petitioner pulled out a gun and fired a shot into

the air.[2] The testimony consistently places petitioner at approximately one-to-two car lengths

from Vasquez and Re.[3]

Re testified as to what occurred next:

Q.      …After the initial shot, what did you see [petitioner] do?
A.      The first shot I didn't see. The second shot, that went in and out of my
        leg.
Q.      Describe what the defendant did when that shot was fired. Show the jury.
A.      His exact words was, Yeah, nigger; yeah, nigger. He let it off. It went in
        my leg and came out. I screamed, you shot me. Yeah, nigger; yeah,
        nigger. Lets off another one. That one goes by me. (195).

The prosecutor described for the record what Re demonstrated for the jury: "You are

showing your hands in an up and down motion simulating a gun but firing at below shoulder

_____

[2] Re testified: "As he sucker-punched me, I heard a shot simultaneously." (243). Alita Re said
she heard the shot and "everyone stopped" and then Vasquez punched Re. Regardless, the
testimony was consistent that petitioner fired this first shot into the air.

[3] Translating the descriptions given by the witnesses at trial, both petitioner and respondent agree
on this fact. See ECF No. 6-4 at 33 (petitioner's appellate brief) and 85 (respondent's appellate
brief).

length;" Re replied "Yes." (196).

Re summarized: "Shot one was in the air. Shot two goes through my leg. Shot three goes by me. The other three, as I was stepping to the left, stepping over to the left, I heard another three shots." (196).[4] Re headed toward his car, entered it, and drove off until he encountered an ambulance.

Pressed about his account on cross-examination, Re testified: "As he sucker-punched me, I heard a shot simultaneously. I back-stepped into the street. He was bringing his arm down and he was lifting back up like yeah, nigger, yeah nigger. I was like, you f*cking shot me. Yeah nigger, yeah nigger. He goes to lift up again as I'm taking off." (243). Re also testified that when he heard the first shot, "I had tunnel vision on the barrel of the gun. Nothing else mattered to me other than the tip of that barrel being faced to me." (245). Counsel clarified, "So your testimony is that you looked at the barrel of that gun?" and Re replied, "Yes." (245).

Each of the other eyewitnesses demonstrated how petitioner fired the shots. One witness pointed her hand "to simulate a gun" and then "mov[ed] her hand up and down in a rapid motion" (128); another witness "indicat[ed] a throwing manner, swinging his arm from high to low" (319); while a third was "flinging her arm from her chest outward." (371). One of these witnesses added that petitioner "wasn't aiming it. It was like he had a hammer in his hand" (318). Re was asked "was [petitioner] aiming" and replied, "[w]hen he pulled up, that's aiming,

---

[4] On cross-examination, Re reiterated, "I back-stepped into the street. He was bringing his arm down and he was lifting back up like yeah, nigger, yeah nigger. That went off and went in and out of my leg. I was like, you f*cking shot me. Yeah nigger. Yeah nigger. He goes to lift up again as I'm taking off." (243)

yes." (246).[5]

Neither Re nor any of the other three eyewitnesses saw anyone else with a gun or heard any shots other than those fired by petitioner.

Petitioner waived his <u>Miranda</u> rights and made an oral statement later reduced to writing admitted into evidence through a police witness.[6]  In that statement, petitioner volunteered that after Vasquez "removed the gun from his coat pocket," he "told [petitioner] 'Yo, I'm a fight him, but if sh*t gets crazy burn that nigga'"

Petitioner offered this account of the shots he fired:  "The two of them began fighting as I watched…then towards the end of the fight… the man had [Vasquez] pressed against the car, me and [Vasquez] made eye connection, and he gave me a What the hell are you doing face, I then fired [one] shot in the air to break the fight up."  He continued: "In that split second [Vasquez ] and the man looked at me, and the man did not let his choke hold go, so I fired a shot towards him.  They then separated."

Addressing the additional shots he fired, petitioner stated that, after Vasquez and Re separated, "That is when I heard two shots of return fire.  I ducked down by the car, waited,

---

[5] To complete the narrative, though not relevant here: Re fled after being shot and Vasquez was then discovered slumped against a wall, not moving.

[6] Respondent reports that the version of petitioner's handwritten statement read into the record by NYPD Detective Gregory Naeder (266-267) differs in non-material ways from the actual written statement admitted into evidence as People's Exhibit 17.  Quotes here are from the latter.

As for the events preceding the fight, petitioner offered a slightly different account than Re, claiming that it was Re who insulted Vasquez and him, and also that it was Re who initiated the fight by saying to Vasquez and him, "Whats up, niggas want to fight or something? why niggas watching me?"

looked up, and saw [Re] running towards the crowd. I then fired one more shot toward him." He further stated that he "shot at [Re] because [he] didn't know if he was one of the people that was shooting." (As noted, however, no other witness heard or saw any shots other than those fired by petitioner, while Re testified that he was fired at as he fled).[7]

Finally, petitioner admitted that he left the scene and went to Vasquez's house to tell his family what had happened, and that after learning that Vasquez had died, he went toward the shore "and threw his gun in the water before going home." No ballistics were recovered; the officer responding to the scene testified that because of the snow it was possible small items were lost. (106-07, 111).

## DISCUSSION

**GENERAL HABEAS STANDARDS**

Habeas relief is authorized "only on the ground that [an individual] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Review of these federal claims is highly deferential to the state courts. As the habeas statute provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

---

[7] Additionally, Vasquez's brother Jesus testified that in his initial conversation with petitioner after the incident, petitioner said that "he th[ought] he may have shot [Vasquez] in the leg" (61) but later, after learning Vasquez had died, petitioner said, "It wasn't me. There was another shooter there. Oh my god, they killed my brother." (63-64).

28 U.S.C. § 2254(1), as amended by the Antiterrorism and Death Penalty Act of 1996 ("AEDPA").

This statute "erects a formidable barrier to federal habeas relief," Burt v. Titlow, 571 U.S. 12, 19 (2013), because it embodies "a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights . . . and are thus presumptively competent [ ] to adjudicate claims arising under the laws of the United States." Id. at 19. Federal habeas courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." Id. at 16 (internal quotations, citations and alterations omitted). See also Virginia v. Le Blanc, 137 S.Ct. 1726, 1728 (2017) ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice") (internal quotation marks and citations omitted); but see Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) ("As we have also observed, however, even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief.") (internal quotation marks, citation and alterations omitted).

In short, the "contrary to or unreasonable application" standard codified by AEDPA "means that a state court's ruling must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Shoop v. Hill, 139 S. Ct. 504, 507 (internal quotations and citations omitted). Accord Orlando v. Nassau Cty. Dist. Attorney's Office, 915 F.3d 113, 121 (2d Cir. 2019) ("unreasonable application" standard of § 2254(d)(1) is a "bar [that] is not reached where fairminded jurists could disagree on the correctness of the state court's decision") (internal quotation and citation omitted).

**ANALYSIS OF PETITIONER'S CLAIMS**

**1.      The Sufficiency Claim**

Petitioner's claim that there was insufficient evidence of intent to support his convictions of second-degree murder and second-degree attempted murder does not present a basis for habeas relief, for several reasons.

First, the Appellate Division found the claim "unpreserved for appellate review," citing New York's contemporaneous objection rule, C.P.L. § 470.05.  See Casseus, 120 A.D.3d at 828. The sufficiency claim, therefore, is barred from review here by the independent and adequate state law doctrine.  See generally Davila v. Davis, 137 S. Ct. 2058, 2064 (2017); Coleman v. Thompson, 501 U.S. 722, 729 (1991).  A state procedural bar "is 'adequate' if it 'is firmly established and regularly followed by the state in question' in the specific circumstances presented."  Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007) (internal quotation and citation omitted), cert. denied, 552 U.S. 1150 (2008) (quoting, Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)).  The requirement that an issue be preserved by contemporaneous objection as required by NY CPL § 470.05(2) is a firmly established and regularly followed rule for these purposes.  Richardson v. Greene, 497 F. 3d 212, 217-18 (2d Cir. 2007); Petronio v. Walsh, 736 F. Supp. 2d 640, 653 (E.D.N.Y. 2010).  This bar applies "even where," as here, "the state court has also ruled in the alternative on the merits of the federal claim."  Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); see also Harris v. Reed, 489 U.S. 255, 264 n. 10, (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding") (emphasis in original).

The bar erected by the independent and adequate state law doctrine may be lifted only if a petitioner demonstrates either "cause" for failing to comply with the state rule and "actual

prejudice" if the claim is not reached, or that a lack of federal review will result in a fundamental miscarriage of justice because he is actually innocent. <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989); <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87 (1977). Petitioner has not addressed this feature of his claim.

Second, the sufficiency claim is unexhausted because petitioner did not include it in his application for leave to appeal to the Court of Appeals. <u>See</u> ECF Doc. 6-4 at pp. 137-144 (petitioner's leave application addresses only his ineffectiveness claim). The "one complete round of the State's establish appellate review process" that a petitioner must invoke to satisfy the exhaustion requirement includes seeking review by the Court of Appeals. <u>Galdamez v. Keane</u>, 394 F.3d 68, 74 (2d Cir. 2005) (quoting <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999)). Unexhausted claims of course cannot form a basis for habeas relief. <u>See generally</u> 28 U.S.C.§ 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that [ ] the applicant has exhausted the remedies available in the courts of the State"); <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971) (discussing exhaustion requirement); <u>Daye v. Attorney Gen. of State of New York</u>, 696 F.2d 186, 191 (2d Cir. 1982) (same). Because petitioner cannot return to state court to seek leave a second time to seek to exhaust the claim, it is deemed exhausted but procedurally barred. <u>See</u>, <u>e.g.</u>, <u>Mitchell v. Griffin</u>, 2019 WL 6173788, at *5 (E.D.N.Y. Nov. 20, 2019) (collecting authorities). As noted, petitioner has not even addressed this aspect of his claim.

Third, and in any event, the claim lacks merit. The Appellate Division found in the alternative that, "viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish [petitioner's] guilt of these crimes [murder and attempted

murder] beyond a reasonable doubt." Casseus, 120 A.D.3d at 148-49.[8]   Were the claim

available for review, petitioner would be entitled to habeas relief only if he could show that the

Appellate Division's rejection of his sufficiency claim was an unreasonable application of the

controlling Supreme Court authority, or factually unreasonable, within the meaning of AEDPA.

The applicable Supreme Court authority is Jackson v. Virginia, 443 U.S. 307 (1979); see

also Cavazos v. Smith, 565 U.S. 1, 2 (2011) (reaffirming that Jackson controls in § 2254

context).

Under Jackson,

> the critical inquiry ... does not require a court to ask itself whether *it* believes that
> the evidence at the trial established guilt beyond a reasonable doubt. Instead, the
> relevant question is whether, after viewing the evidence in the light most
> favorable to the prosecution, *any* rational trier of fact could have found the
> essential elements of the crime beyond a reasonable doubt. This familiar standard
> gives full play to the responsibility of the trier of fact fairly to resolve conflicts in
> the testimony, to weigh the evidence, and to draw reasonable inferences from
> basic facts to ultimate facts. Once a defendant has been found guilty of the crime
> charged, the factfinder's role as weigher of the evidence is preserved through a
> legal conclusion that upon judicial review *all of the evidence* is to be considered
> in the light most favorable to the prosecution.

Id. 443 U.S. at 318-319 (internal quotations and citations omitted) (all emphases supplied by

Jackson Court).  And, where the state has first rejected the sufficiency claim on the merits,

federal habeas deference is doubled.  Cavazos, 565 U.S. at 2 ("the deference to state court

decisions required by § 2254(d)" is to be "applied to the [ ] already deferential review" of

Jackson").

---

[8] Further, the Appellate Division, "in fulfilling [its] responsibility to conduct an independent
review of the weight of the evidence," was "satisfied that the verdict of guilt as to these
convictions was not against the weight of the evidence." Id. at 149.

Under N.Y. Penal Law § 125.25 (1), "[a] person is guilty of murder in the second degree when [ ] [w]ith intent to cause the death of another person, he causes the death of such person or of a third person." Petitioner's position is that he acted erratically or with intent to injure but not intent to kill. Construed most liberally, petitioner's argument appears to be, in essence, that because he fired from such close range (one-to-two car lengths), if his intention was to kill Re he would have succeeded. Presumably, under this theory, he is to be applauded for his precision, when firing a deadly weapon into a group of people, for having only injured Re in the leg with bullet number two and for having just missed him with bullet number three.

Regardless, it is the *next* two shots that petitioner fired—"toward" Re *after* the fistfight with Vasquez had ended—that must defeat his sufficiency claim. These additional shots also likely explain the jury's choice to convict on intentional rather than depraved indifference.[9] As noted, petitioner offered through his statement a self-serving explanation for shooting the gun again: he stated that after the combatants separated he "heard two shots of return fire…ducked… looked up, and saw [Re] running towards the crowd [and] then fired one more shot toward him." But the four eyewitnesses—Re and his entourage—all say they did not see or

_____

[9] Although the court charged the jury on intentional and depraved indifference in the disjunctive, the prosecution argued in summation that petitioner "committed. . . *both* counts of murder in the second degree." (496, emphasis added). At times the prosecution combined the theories; for example, the prosecutor argued that "[t]he [petitioner's] intentional conduct by raising that gun and shooting four or five time[s] is evidence in and of itself of reckless disregard for human life. He didn't mean to cause grievous harm, but he didn't care whether grievous harm resulted. This is the classic example of when, his intent to kill [Re] went awry, he was so blinded by his intent … he didn't even see his best friend in the cross-fire." (483).

Elsewhere, however, the prosecution offered a theory roughly approximating the sufficiency path traveled here, urging the jury to "follow the bullets, follow the shots." (495) Conceding that this was "not a premeditated planning type of case," the prosecutor argued that petitioner "formed" his intent to kill "when he continued to fire at [Re] as [Re] ran away." (493).

hear another shooter.

Viewing the evidence in the light most favorable to the prosecution, a rational juror could have decided, first, that petitioner was lying when he offered the presence of another shooter as his reason for firing toward Re and second, that, because petitioner had *already* injured Re *and* the fight was over, petitioner's intention in firing toward Re again must have been to kill Re. To be sure there are other possibilities—but at that point, lethal intent became *an* available rational inference, which ends the sufficiency analysis. <u>See</u> <u>Jackson</u>, 443 U.S. at 326 ("a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").[10]

## 2. The Trial Court's Failure to Instruct on Justification.

As on direct appeal, petitioner claims that the trial court erred in denying his request for a charge on the defense of justification. The Appellate Division, applying New York law, rejected the claim on the merits. <u>Casseus</u>, 120 A.D.3d at 829 ("the trial court properly declined to give a justification charge since, viewing the record in the light most favorable to the defendant, there was no reasonable view of the evidence to support such an instruction") (citing, *inter alia*, NY Penal Law § 35.15[2][a]).

This claim fails to present a basis for habeas relief.

First, like the sufficiency claim, petitioner omitted this claim from his application for

---

[10] The Appellate Division justice dissenting on the issue of ineffectiveness did not dissent from the majority's holding on sufficiency.

leave to appeal to the Court of Appeals, so it is unexhausted, and therefore cannot be the basis for a grant of habeas relief.  <u>See</u> 28 U.S.C. § 2254(b)(1)(A).

Second, the claim is not cognizable on habeas because it presents only a question of state law, to wit, application of the New York standard for use of deadly force delineated in Section 35.15 of the state's Penal Law (titled "Justification; use of physical force in defense of a person").  <u>See</u> <u>generally</u> <u>Gonzalez v. Lee</u>, 2017 WL 3600406, at *9 (E.D.N.Y. Aug. 16, 2017) (failure to give a requested jury instruction does not ordinarily give rise to a constitutional issue); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

In any event, the trial court's rejection of the request appears to be correct under New York law.  Section 35.15 of the Penal Law provides, of relevance here, that the use of physical force is not justified when the actor "was the initial aggressor," PL § 35.15(1)(b), or when "the physical force involved is the product of a combat by agreement not specifically authorized by law."  <u>Id.</u> (1)(c).

The trial court initially assumed that defense counsel asked for the instruction on the theory that petitioner was "justified" in trying to defend his friend Vasquez.  (439, 446-47).  Instead, counsel advanced the strained argument that the shots fired during the fistfight and the shot(s) fired as Re was fleeing "could be viewed as two separate incidents."  (448).  He stated that when petitioner "believed that two shots were fired at him…[t]his became a whole different situation.  It had nothing to do anymore with the combat that was taking place.   The combat had already broken up." (<u>Id.</u>)

13

In rejecting the request, the trial court noted the lack of evidence supporting the claim in petitioner's statement that another shooter was firing towards him,[11] and found there was no basis to "segment" (449) the incident or the justification charge. The court concluded, correctly, that Section 35.15 foreclosed a justification charge here because petitioner was the "initial aggressor" and the shots he fired were the "the product of a[n unlawful] combat by agreement" between Vasquez and himself. See People v. Rollins, 51 A.d.3D 1279, 1281 (3D Dep't 2008) (applying "combat by agreement" provision to uphold denial of justification charge); see also People v. Valentin, 29 N.Y.3d 57, 61-62 (2017) (discussion of the initial aggressor doctrine).

In any event, even if the trial court had misapplied New York justification law, the court's failure to charge justification would still not provide a basis for habeas relief. While jury instruction error may be cognizable on habeas if fair-trial/due-process concerns are implicated, see generally Cupp v. Naughten, 414 U.S. 141, 146-47 (1973), the standards are formidable and such error has not been shown here. Cupp, 414 U.S. at 146 ("Before a court may overturn a conviction" because of jury instruction error, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."). The trial court's refusal to charge justification plainly did not deny petitioner a fair trial.

## 3.     The Ineffective Assistance of Counsel Claim

Petitioner claims that counsel was ineffective for declining the submission of first-degree manslaughter as a lesser-included offense ("LSO") of intentional second-degree murder.

---

[11] The court: "I didn't hear any evidence substantiating that two shots were fired at the defendant. I heard from…that nobody ever saw a[nother] person shooting." (449).

Relevant to the argument, and to appreciating the colloquy at the charging conferences, is the fact that *two* of the statutory theories of first-degree manslaughter were under consideration.

Penal Law § 125.20 provides, in pertinent part, as follows:

A person is guilty of manslaughter in the first degree when:

1.  With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or

2. With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as defined in paragraph (a) of subdivision one of section 125.25. The fact that homicide was committed under the influence of extreme emotional disturbance ("EED") constitutes a mitigating circumstance reducing murder to manslaughter in the first degree…

P.L. § 120.20 (2). See also P.L. §125.25 (the second-degree murder statute referenced in paragraph 2, provides that "acting under the influence of" EED "is an affirmative defense" to intentional second-degree murder. The crime defined in subparagraph (1), based on intent to cause serious physical injury, is considered the true LSO, whereas the crime defined in subparagraph (2) provides for a reduction in culpability when EED (as either a "mitigating circumstance" or "affirmative defense") is established.

At a preliminary conference, the prosecution conceded that the LSO for each murder theory would ordinarily have to be submitted; *i.e.*, first-degree manslaughter as the LSO for intentional murder and second-degree manslaughter for depraved-indifference. (404). The prosecutor did not, however, specify a type, or theory, of first-degree manslaughter. Defense counsel remarked that the record might support EED first-degree manslaughter, referring to EED as "a statutory defense." (405)

During the formal charging conference, when the court raised the subject of "the lesser

includeds … I'm talking here about manslaughter 1 and 2," the following ensued:

> Court: [b]asically, they are legal lesser-includeds. The question is: Is there a
> reasonable view of the evidence to support their submission? Maybe you
> [addressing defense counsel] don't want it. If you don't, then I wouldn't
> give it. The People don't want it.
>
> On the other hand, if you think they should be submitted and you can
> point to some reasonable view of the evidence that would justify
> submission of the lesser includeds, I will certainly consider that. (422-23)

> Counsel: I will argue from the People's perspective Man. 1 would be appropriate
> because there was some evidence that there may have been some high
> emotion. It was a highly emotional situation and certainly there was no
> premeditation. There was a lot of testimony of waving the gun around,
> and I believe based on the People's position there was some evidence of a
> highly emotional disturbance.

> Court: The statute is clear. With intent to cause serious physical injury you cause death.
> That's Manslaughter 1. I understand your position is that your client was just
> shooting to break up a fight . . . But you do you think there's a reasonable view of
> the evidence whereby a jury could find that your client intended to cause serious
> physical injury and caused death? That's Man. 1. If you think there is—

> Counsel: I guess there is no theory from the defendant's standpoint to support a Man. 1.

> Court: So you're asking for Man. 1 based on emotion?

> Counsel: Yes.

> Court: And that's the only reason you're asking for it?

> Counsel: Yes. (423-24)

The prosecutor added: "it's our position that it's not a lesser included on an EED theory.
It's only a lesser included on [the theory of] an intent to cause serious physical injury and [sic]
causes death." (424-25). The court stated, "I agree with that. I didn't hear any emotional
disturbance testimony." (425). Finally, counsel added, "[t]hat doesn't make it a lesser
included," the Court clarified, "[t]hat's a reduction," and counsel agreed, "[r]ight." (425).

In sum, defense counsel asked that the court submit first-degree manslaughter *only* as defined in subsection 2 of PL § 120.20, *i.e.*, as a "reduced" crime, due to the EED "mitigating circumstance" or "affirmative defense," but not as the crime defined in subsection 1 of PL §120.20, *i.e.*, as the crime of intending to injure but causing death, the LSO of intentional murder).

After the court announced its ruling on the threshold matter—that it would submit both intentional and depraved indifference as alternative counts—it revisited the question of LSOs:

> Court:  And in terms of lesser includes, as I understand it, Mr. Lamb (defense counsel), you're not requesting manslaughter 1, but you are requesting manslaughter 2, is that right, or did I misunderstand you? I don't know.
>
> Counsel: Could I have a minute to think about it?
>
> (short pause)
>
> Counsel: Depending on how you ruled on the – I would ask not to have that charged.
>
> Court: I beg your pardon?
>
> Counsel: I will ask to have it not charged.  I want manslaughter 2, but not manslaughter 1. (444)

In the Appellate Division, as here, petitioner claimed that "he was deprived of the effective assistance of counsel because his trial attorney failed to request submission of manslaughter in the first degree as a lesser included offense of intentional murder," and the majority found the contention "unpersuasive."  <u>Casseus</u>, 120 A.D.3d at 829.  The court concluded: "Rather, counsel's decision reflected a legitimate trial strategy of a reasonably competent attorney."  <u>Id.</u>

The majority reasoned as follows:

counsel's decision . . . was consistent with the defendant's statements to the police that he merely fired his weapon for the purpose of breaking up the fight, and not with the intent to kill or injure anyone.  By declining to request the lesser included offense of manslaughter in the first degree and seeking only the submission of manslaughter in the second degree, trial counsel logically elected to remove from the jury's consideration the possibility of a "compromise" guilty verdict on the former offense.  Hence, if convinced of the defendant's culpability for the homicide but not that he possessed the mens rea for murder in the second degree, the jurors could only have found that he acted recklessly, as the defendant's own statements suggested. The fact that this reasonable strategy proved unsuccessful does not equate with ineffective assistance of counsel, and the defendant's assertions to the contrary confuse true ineffectiveness with mere losing tactics and accord undue significance to retrospective analysis.

Id. at 829-830 (internal citations and alterations omitted).

The dissent concluded differently.  First, the dissent found that "petitioner's conduct, as described by eyewitnesses, and his statements to police, strongly indicated that he may not have intended to kill anyone, but, rather, to the extent he was aiming the gun at all, he fired in the air or at the legs of the participants to stop the fight."  Id. at 831.  Observing that at the charging conference, "counsel requested a charge of manslaughter in the first degree based upon an affirmative defense of extreme emotional disturbance," the dissent noted that "[w]hen making this request, defense counsel stated, in effect, that extreme emotional disturbance was the only basis upon which he was requesting" submission of that charge.  Id.  In the dissent's view, "a reasonable view of the evidence supported" the other theory of first-degree manslaughter, i.e., "transferred intent to inflict serious physical injury" and further notes that "the trial court offered to instruct" with respect to this theory.  Id. at 832.  Finally, the dissent concludes that "[d]efense counsel's failure to request or agree to an instruction with respect to manslaughter in the first degree based upon an intent to cause serious physical injury was not supported by any viable trial strategy," "was a prejudicial error which may have affected the outcome," and therefore "constituted ineffective assistance of counsel warranting a new trial."  Id.

Notwithstanding the Appellate Division's dissent, this Court concludes that the majority's rejection of petitioner's inefficiency claim was not an unreasonable application of the controlling Supreme Court law.

Although the familiar standard hardly needs lengthy recitation, its elements are nevertheless crucial here. Under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), a petitioner must show, first, that "counsel's representation fell below an objective standard of reasonableness," 466 U.S. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. On the deficiency prong, the court's "inquiry must be whether counsel's assistance was reasonable considering all the circumstances." <u>Id.</u> at 688. Further, the "court … must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" and "must [ ] determine whether the [challenged actions or decisions] were outside the wide range of professionally competent assistance." Id. at 690.

To prevail on habeas on an ineffectiveness claim that the state court has already rejected on the merits, a petitioner must show that "the state court applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner." <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002). This is a formidable burden: "[s]urmounting <u>Strickland's</u> high bar is never an easy task," <u>Padilla v. Kentucky</u>, 559 U.S. 356 (2010), and "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult [because] [t]he standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." <u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011) (internal quotation and citation omitted) (emphasis added); <u>see</u> <u>also</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011) ("review of [state court]'s decision is ... doubly deferential [because] [w]e take a highly

19

deferential look at counsel's performance [under Strickland] through the deferential lens of § 2254(d)") (internal quotations and citations omitted) (emphasis added). The <u>Strickland</u> standard, the Supreme Court has reminded district courts, is "a general one" and, therefore, the "range of reasonable applications is substantial." <u>Harrington</u>, 562 U.S. at 105. Further, "habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under [section] 2254(d)." <u>Id.</u> The difference is crucial: "[w]hen § 2254(d) applies, the question is *not* whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standards." <u>Id</u>. (emphasis added). <u>See also</u> <u>Pinholster</u>, 563 U.S. at 196 (attorney need not state his reasons; rather, the court must "affirmatively entertain the range of possible reasons [ ] counsel may have had for proceeding as [he] did") (internal quotation marks omitted); <u>Greiner v. Wells</u>, 417 F.3d 305, 320 (2d Cir. 2005) (court must "look for legitimate justifications for [counsel's] conduct, including justifications transparent on the record and justifications offered by counsel").

The Appellate Division majority's determination that counsel's decision to decline the first-degree manslaughter charge reflected a legitimate trial strategy is not an unreasonable application of <u>Strickland</u>'s deferential deficiency prong. Counsel's quoted remarks from the charging discussions speak for themselves: he addressed the different types of first-degree manslaughter with precision, did request (albeit unsuccessfully) first-degree manslaughter based on EED rather than intent to injure, and paused to reflect before stating his final position to the court. The nature of these remarks alone strongly indicate that counsel had a theory in mind and that a strategy underlay his remarks and ultimate decision about which counts to submit. That is the dispositive determination for <u>Strickland</u> purposes; whether that strategy ultimately succeeded is not.

Notwithstanding the jury's ultimate view of the matter and independent of the discussion *supra* with respect to sufficiency, it would not have been unreasonable for counsel to have decided that, on the facts, his client faced a greater risk of conviction for reckless rather than for intentional conduct, and to have tailored his strategy accordingly. Consistent with such a strategy, counsel *did* ensure that the jury was given the LSO for depraved-indifference, *i.e.*, the lesser recklessness-based crime of *second*-degree manslaughter (defined as "recklessly causing the death" of another). Also consistent with that strategy, his summation attempted to take intent off the table altogether: he argued that petitioner was shooting "erratically" but did not intend even to injure, much less kill anyone—and this, too, is not unreasonable based on the facts.[12] Finally, he elected to remove a *second* intent-based crime from the jury's consideration. A gamble, to be sure. *A fortiori*, a strategy. And one that it was plainly within the range of competent professional judgment to elect, on this record, and in light of his client's post-arrest statements.

## CONCLUSION

For all the reasons discussed, the application of petitioner Drew Casseus for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

---

[12] It is perhaps necessary to say: although bullets four and five—those fired "toward" Re after the fistfight ended—are what defeat petitioner's sufficiency claim—it is clear that the bullet that killed Vasquez (it could be none other than number three)—was fired when recklessness was plainly more than arguable.

The Clerk of the Court is directed to serve a copy of this Memorandum and Order upon petitioner, who is incarcerated appearing pro se.

SO ORDERED.

Dated: Brooklyn, New York
      March 23, 2020

                                  /s/ Raymond J. Dearie U.S.D.J

                                  RAYMOND J. DEARIE
                                  United States District Judge